# Exhibit "B"

Defendant's
Sworn
Affidavit
Three Pages

## AFFIDAVIT OF CRYSTAL TREVINO

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF BEE | § |

BEFORE ME, the undersigned authority, personally appeared Crystal Trevino, who being duly sworn, deposed as follows:

"My name is Crystal Trevino. I am over 21 years of age, of sound mind, and fully qualified to testify in this area. I have never been convicted of a crime. I have personal knowledge of the facts stated herein and all facts and statements are true and correct.

I am a defendant in *Erbey Flores v. Crystal Trevino*, USDC Southern District of Texas, Corpus Christi Division, Civil Action No. 2:13-cv-298. I am completing this affidavit in response to the plaintiff's allegations based on an incident that occurred at the Texas Department of Criminal Justice's (TDCJ) McConnell Unit on March 31, 2013.

I am currently employed by TDCJ as a correctional officer (CO) V at the McConnell Unit in Beeville, Texas. I have been employed by TDCJ for approximately 8 years, and I have been a CO V at the McConnell Unit since November 2013. At the time of the complained-of incident I was employed by TDCJ as a CO IV at the McConnell Unit.

On March 31, 2013 I was working at the McConnell Unit and was asked to assist with feeding the dinner meal on 3-building, C-pod. That night offenders were eating in their cells as opposed to in the chow hall. When feeding offenders in their cells both offenders in the cell are ordered to move to the back of the cell or sit on their bunks, away from the cell door, prior to the meals being placed in the cell by the rover (correctional officer). This is for the safety and security of the officers and offenders. Once the offenders have moved to the back of the cell or are sitting on their bunks, the cell door is opened by the picket officer at the signal of the rover so

that the rover – me, in this case – can place the "johnnie sacks" (sack dinner) in the cell. The officer immediately rolls the door closed once the johnnie sacks have been placed in the cell.

On March 31, 2013, I was responsible for feeding the plaintiff, Offender Flores, because he lived on 3-building, C-pod. When I arrived at Flores's cell, he was standing near the cell door yelling and cursing loudly at me. As I do at each cell, I instructed Flores to move away from the cell door so that I could feed him and his cell mate. He refused to comply with the order, continuing to curse at me. Flores's actions were disrupting the feeding of chow, and I made the decision to continue feeding down the row in order to stay on schedule and in hopes that he would calm down. Upon returning to Flores's cell, I asked him again to move away from the cell door so that I could open the door and place the meals in the cell. Flores refused my order and continued cursing, and, without warning, the cell door began to open. In a split second I slammed the door shut for fear that Flores would exit the cell. Flores is considerably larger than me as I am a petite female, and as I grabbed the door to slam it shut I thought of nothing but being attacked by a belligerent inmate. Then, without warning, the cell door began to open again, and in an instant I slammed the door again, afraid for my own safety. I slammed the door both times in a split second without taking even a second to think or check for the offender's hand (which he had no reason to have in the doorway considering he had been told repeatedly to move to the back of the cell).

Flores finally backed away from the cell door, and he bent over with his hand pulled to his chest. I asked him what was wrong, and he commented that I had hit him with the door and his hand was hurt. I called for my supervisor, Sgt. Moreno, and Flores was taken to the medical department. I then returned to my normal duties.

2

When, without warning, the cell door opened as Flores stood at the door cursing, yelling and refusing to obey my orders to move away from the doorway, I made a split-second decision both times to slam the door shut to protect myself from what I perceived to be a situation threatening my personal safety. At no time during the complained-of incident did I intend to use force against Flores in order to gain compliance from him or to cause him any harm. At all times relevant to this suit, I performed all of my duties as a TDCJ CO IV to the best of my abilities and with the good faith belief that my actions were reasonable and in accordance with the law.

In witness whereof, I have hereto set my hand in this the 24 day of July, 2014."

Crytsal Trevino

**SWORN TO and SUBSCRIBED** before me, by the said **CRYSTAL TREVINO** on this the 24 day of July, 2014. To certify which witness my hand and seal of office.

NOTARY PUBLIC in and
for the State of Texas

Candace Moore

Printed name of Notary

My Commission expires: 9|6|2017

CANDACE
MOORE
Notary Public State of Texas
My Commission Expires
09-06-2017
Notary Without Bond

3

Exhibit "C"

Plaintiff's Rough
Draft of
3 - Section
Three Pgs.

Exhibit 3



Exhibit.

64 - cell

Stairs

63 - cell

62 - cell

61 - cell

C. Pod 3 - Section C - Rec

166 - cell     59 - cell     58 - cell     57 - cell

Showers

Exhibit

3 of 3

STAIRS

72 - cell

71 - cell

C.Pod. 3 - Section. B - 200

70 - cell

69 - cell

68 - cell     67 - cell     66 - cell     65 - cell

Shower

Exhibit "D"

Mr. DeShannon
Jackson's Sworn
Affidavit
One Page.

WITNESS AFFIDAVIT

STATE OF TEXAS
COUNTY OF BEE

RE: CAUSE NUMBER 2:13cv00298, FLORES vs. TREVINO, et. al.

"My name is Deshannon Jackson, and my T.D.C.J. number is 905236. I am over 18 years of age, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

"I have been housed at the McConnell Unit, in Beeville Texas, for approximately fourteen years, and in that time it has been the customary practice of officers working here to feed johnnies in the following manner:

The officer working on the floor (rover) will enter, say 3-section on C-Pod, either go to 49-cell or 56-cell. Once the rover is standing in front of a cell, the Pickett Officer will automatically open that cell door. The signal to open the cell door is to stand in front of it.

When the cell door opens the offender will reach-out for his johnnies OR if the offender is not standing by his cell door the rover will reach-in and pass the offender his johnnies. Since we are low-risk offenders, we are not ordered to move away from the cell door OR to sit on our bunks.

Offenders from general population in 3bldg. and 4-bldg (which consist of A, B, C, D, E, AND F Pods) are workers; trusty's and the medically unassigned offenders.

As a matter of fact when the johnnies are wheeled into a section, they are in a bread crate with wheels. We also receive with our johnnies something to drink, whether its tea, lemonade, kool-aid, or milk, therefore when the rover goes to feed two and three-rows the offenders must help them, by closing our own cell doors, because the rover cannot wheel the bread crate up the stairs. And after we receive our johnnies we reach-out with our cups in order to get our drink, or we are allowed to go to the dayroom to get cold water from the water cooler.

I THE UNDERSIGNED DECLARE UNDER PENALTY OF PERJURY THAT I AM THE WITNESS IN THE ABOVE INSTRUMENT, THAT I HAVE READ SAID INST-RUMENT, AND THAT THE INFORMATION CONTAINED THEREIN IS TRUE AND COR-RECT. Pursuant to Title 28 U.S.C. §1746.
Signed on this 11TH day of AUGUST, 2014.      DeShannon Jackson#905236
                                              3001 South Emily Drive,
                                              Beeville, Texas  78102

c.c. file:dj/ef(wa)

Exhibit "E"

Mr. Shawn Clack's

Sworn Affidavit

One Pg.

WITNESS-3 AFFIDAVIT

STATE OF TEXAS
COUNTY OF BEE

RE: CAUSE NUMBER 2:13-cv-00298, FLORES vs TREVINO, et. al.

"My name is Shawn Clack, and my T.D.C.J. number is 690123. I am over 18 years of age, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated:

I have been at the McConnell Unit, at Beeville, Texas, for approximately fourteen years and in that time it has been the customary practice of the staff to feed the johnnies in the following manner:

The officer working the floor (rover) will come in the section with the johnnies in a crate with wheels on it, and go stand by either 49-cell or 56-cell. As soon as he/she is in front of the cell, the pickett officer will open that cell door. That's the one signal I know they got (stand in front of the cell). As soon as the cell door is opened the offender will reach-out for his johnnies <u>or</u> if the offender is not standing by his cell door, then the rover will reach-in and hand the offender his johnnies.

We also get drinks, so when we have our johnnies, we are allowed to go to the dayroom for some cold water from the cooler or the rover will have tea, lemonade, kool-aid, or milk for us to drink.

Offenders in general population (G-2's) are low-risk, therefore, we are not ordered to move away from the cell door <u>or</u> to sit on our bunks prior to receiving our meal (johnnie). Offenders in 3-bldg. and 4-bldg. are workers; trusty's; and medically unassigned offenders that pose little or no threat to staff.

Furthermore, when the rover feeds two and three-rows they sometimes require our assistance in closing the cell doors, since they have their hands full (packing the crate), and handling the pitcher for, or with our drink.

THE UNDERSIGNED DECLARES UNDER PENALTY OF PERJURY THAT HE IS THE WITNESS IN THIS AFFIDAVIT, THAT HE HAS READ THIS AFFIDAVIT, AND THE INFORMATION CONTAINED THEREIN IS TRUE AND CORRECT PURSUANT TO TITLE 28 U.S.C.§1746.
Signed this the 6 day of August , 2014. _Shawn Clack_

c.c. file: sc/ef(wa)

Shawn Clack, #690123
3001 South Emily Dr.
Beeville, Texas. 78102

Exhibit "F"

Mr. Ray Rodriquez's

Sworn Affidavit

One Page.

<u>WITNESS AFFIDAVIT</u>.

STATE OF TEXAS
COUNTY OF BEE

<u>RE : FLORES V TREVINO, CAUSE NUMBER 2:13-cv-00298</u>.

"my name is Ray Rodriguez, and my T.D.C.J. number is _101046_. I am over 18 years of age, of sound mind, capable of making this affidavit, and have personal knowledge of the facts herein stated :

"I have been at the McConnell unit, for approximately _7_ yrs, and in that time is has been the customary practice of officers in this unit to feed the johnnies in a variety of ways :

a) We have been fed johnnies in the dayroom, while watching the T.V., <u>and</u> there is a shortage of staff ;

b) We have been fed johnnies in the outside recreation, while at play and/or lifting weights ;

c) We have been fed johnnies in the cell ; and

d) We have been fed johnnies while attending school and/or medical appointments.

The opening of the cell doors, while we are fed johnnies in the cells, is also done in a variety of ways :

a) The pickett officer will often roll (open) all the cell doors of a particular row ;

b) The pickett officer will sometimes roll (open) four cell doors at a time ; and

c) The pickett officer will rarely roll (open) one-cell door at a time, and this is done <u>only</u> when a supervisor is present.

We also get a variety of drinks when we get johnnies, we get lemonade, tea, kool-aid, and/or milk. But if none of this is available we are allowed to exit our cells in order to get cold water from the dayroom cooler.

We are <u>never</u> ordered to step away from the cell door, and/or to sit on our bunks, and the signal for the pickett officer to open the cell door, <u>is to stand in front of that cell door</u>.

I THE UNDERSIGNED DECLARE UNDER PENALTY OF PERJURY THAT I AM THE WITNESS IN THE ABOVE INSTRUMENT, THAT I HAVE READ SAID INSTRUM_ENT, AND THAT INFORMATION CONTAINED THEREIN IS TRUE AND CORRECT. Signed on this _21st_ day of September, 2014. _Ray Rodriguez_

Ray Rodriguez, #_101046_
3001 South Emily Drive
Beeville, Texas 78102.

c.c. file : ef(wa)

Exhibit "G"

Plaintiff's Sworn

Affidavit

Four Pages.

<u>PLAINTIFF'S</u> <u>VERIFIED</u> <u>AFFIDAVIT</u>.

<u>STATE</u> <u>of</u> <u>TEXAS</u>
<u>COUNTY</u> <u>of</u> <u>BEE</u>

<u>RE</u>: <u>CAUSE</u> <u>NUMBER</u> <u>2:13-cv-00298</u>, <u>Flores</u> <u>vs</u>, <u>Trevino</u>, <u>et</u> <u>al</u>.

"I, Erbey Flores, am the Plaintiff in the above styled and numbered civil action and my T.D.C.J. Number is 574931. I'am over 18 years of age, of sound mind, capable of making this affidavit, and I have personal knowledge of the herein stated facts:

<u>PREAMBLE</u>

"Since G-2 offenders are required to eat their hot meals in the dining (chow) hall, the feeding of johnnies is not mandatory, thus, no official policy exists that outlines it's procedures.

Also, since we get johnnies on rare occassions and for various reasons (chief among them is 'Shortage of Staff'), there are a number of ways we recieve our johnnies.

#1. We get them in our cells, wit hout any dayroom time;

#2. We get them in the dayroom;

#3. We get them before and/or after attending medical appointments;

#4. We get them before and/or after attending school classes; and

#5. We've also recieved them while on Outside Recreation.

G-2 offenders (of which I was one of, on the day of the complained-of-incident, and still am to this day), are workers, trusty's and offenders who are medically impaired (I am the latter).

G-2 offenders cell doors are not equipt with food slots, thereby our cell doors must be opened in order for us to recieve our johnnies. Sometimes the Pickett Officer will open all the cell doors of any given row; sometimes the Pickett Officer will open only four cell doors at a time; but if the supervisor is present the Pickett Officer will only open one cell door at a time. We are sometimes given drinks with our johnnies. We get lemonade, tea, kool-aid, or milk; therefore, we must have our cups ready.

<u>THE</u> <u>FEEDING</u> <u>OF</u> <u>JOHNNIES</u>

Each Building has 3-Pods, each Pod has 3-sections, and each section is ·a big room with three tiers. The officer working on the floor(rover) will come into the section with the johnnies & drink, if we are having drinks that particular day. The johnnies are kept in a bread crate that has wheels on it. The johnnies may be

page #1 of 4 pages.

wheeled from cell to cell on one-row, but on 2-row and 3-row they must pack the bread crate with both hands, thereby, offenders will help the rover, by closing their own cell doors after they have recieved their johnnie and drink.

In 3-section, the rover will start on either 49-cell or 56-cell. He/She will stand by a cell door and the Pickett Officer will automatically open that cell door. Thus, the signal to open a cell door IS to stand directly in front of that cell door.

As soon as the cell door opens, the offender therein will reach-out for the johnnies OR if the offender is not standing by his cell door, the rover will reach-in and hand the offender their johnnies. Once the offender has the johnnies, the offender will reach-out with their cups for something to drink, OR in the alternative the rover will allow the offender to step out of the cell in order to get cold water from the dayroom cooler.

The term used to describe a feeding of johnnies, will be a 'Suspension of Activities'.

<u>THE COMPLAINED-OF-INCIDENT</u>.

On 03/31/13, activities were suspended due to a Shortage of Staff (it was Easter Sunday), and we were not receiving drinks on that particular day. Both, Crystal Trevino and her boyfriend (Sgt. Alex Moreno) came into the section to pass-out johnnies. Trevino was one-row, and Sgt. A. Moreno went up to 2 & 3 rows.

Trevino started at my cell (56) and when she arrived at my cell I told her, "They need to put you to work on the Pods more often, Big-Head Ass" Trevino said, "Shut up Flores, just shut the f_ck up." Trevino and I went back and forth with this for a minute, with Trevino telling me to shut up, and me saying that I did not have to shut up. Then Trevino left without giving me the johnnies.

Sgt. A. Moreno, who was the Building's Supervisor that day, then came downstairs and I attempted to talk to him but he ignored me and stood by the dayroom table that's between 55-cell and 56-cell. I stated, "Hey Sarge, we have not been fed yet." Trevino answered saying, "You'll are going to eat last!" I asked, why? and got no answer, so I told Sgt. A. Moreno, "Say Sarge, you need to talk to that Ho, that Ho's tripping" SGt. Moreno said, "What did you do to

page #2 of 4 pages.

her, motherf_ck_r?" I said "I ain't did sh_t!' Sgt. A. Moreno said "We'll see" and went back upstairs, without attempting to resolve the problem.

Trevino came back after feeding all of one-row, and she had the johnnies in her right hand, and in an alevated position that indicated to me, that she was fixing to hand me the johnnies (This is the sole reason I reached-out for them). Trevino then told me "You need to stop talking sh_t" and the cell door opened, I then reached-out with my left hand for the johnnies when Trevino slammed the cell door on my left. The cell door did not lock, but it bounced off my left hand, and I pulled it back into my cell. Trevino then slammmed the cell door shut.

The pain was so intense that I immediately went to the sink and ran some cool water on it, and wrapped my pant's leg on my wrist. My left hand was bleeding. I came back to the cell door and told Trevino that I needed some medical attention. THEN, Mrs. Trevino told me, 'If you want your johnnies, go sit on your bunk" I said "I do not want to eat, I want to go to medical" Trevino again ordered me to back away from the door, I told her I needed medical attention. Then Trevino said, "I'm going to tell them (Administration?) that you intentionally stuck your hand out while I was trying to close it" I told Trevino, "So, your trying to tell me that you saw my hand? Don't worry about it the (Surveillence Video) camara saw" Mrs. Trevino continued telling me to sit on my bunk, and I kept advising her that I needed some medical attention, when her boyfriend, Sgt. A. Moreno came down from upstairs and stopped at my cell door.

I advised Sgt. A. Moreno that Trevino had slammed the celldoor on my hand. Sgt. A. Moreno, again, asked me "What did you do to her motherf_ck_r?" I answered, "Nothing,... Look my hand is bleeding I need to go to medical" Sgt. A. Moreno had the cell door opened and took me to the front desk. When we got there Sgt. A. Moreno told me "You know your probably going to get a case, right?" I told him, "I tried to bring the problem to your attention, but you just ignored me"

With that Sgt. A. Moreno wrote me a pass and sent me to the medical department in a T-shirt, shower shoes, and my left hand bleeding.

page #3 of 4 pages.

As I was walking towards the medical department Officer, Craig A. Pinney, Sgt. Skinner Sturgis, and Sgt. (now Lt.) Clarissa Buentello were at A-Turnout (A-Turnout is the pinnecle of places to work at in the Unit. Since the majority of officers who work there are eventually promoted to sargeants.), Sgt. C. Buentello stopped me and asked me "Where the hell are you going half-naked?" I told her that my hand was hurt, and showed her my bleeding left hand. All three officers asked what happened, I told them that the officer had slammed the cell door on my hand.

Sgt. C, Buentello picked up the phone and called someone, then she stated "Why is this offender not properly dressed and injured doing walking by himself?" Then Sgt. C. Buentello said into the phone, "You should've escorted him". At that time Sgt. Skinner Sturgis escorted me to medical, where he photograghed my hand prior to the bandaging and took my statement, he left at about 8:45 P.M.

When I got to my cell my johnnie was on the table, and the blood had been cleaned off the floor.

On 04/04/13 at approximately 1:50 P.M. Lt. Denise S. Morales and an Escort Team (that consisted of Officers, Dorian Garza; Cynthia Hernandez; and Justin Peninger) took me to medical for a formal U. O.F. Report. I was checked-out by medical, and taken to the back of 10 West where I was strip-searched and provided a U.O.F. Witness Statement, and photograghed. After they turned off the camara I was allowed to go back to my regular housing (3-Bldg., C-Pod, 3-Section, 56-cell). At no time was any offender of 3-section called for the purpose of filling-out a witness statement, nor did I witness any offender refusing to give a statement as to the facts of the complained-of-incident.


Pursuant to Tilte 28 U.S.C.§1746

I, the undersigned do hereby declare under penalty of perjury that the foregoing is true and correct.

Signed this the 1st day of September, 2014.

Erbey Flores, # 574931
3001 sOUTH Emily Dr.
Beeville, TexaS 78102

9/01/14

c.c. file; ef/wa

Exhibit "H."

Mr. Christopher
Ramirez's Sworn
Affidavit.
One Page.

<u>WITNESS</u> <u>AFFIDAVIT</u>

STATE OF TEXAS
COUNTY OF BEE

<u>RE</u>: <u>Cause</u> <u>Number</u> <u>2:13-CV-00298</u>, <u>FLORES</u> <u>V</u> <u>TREVINO</u>, <u>ET.</u> <u>AL.</u>
"

"My name is Christopher Ramirez, and my T.D.C.J.-I.D. Number is 607605. I am over 18 years of age, of sound mind, capable of making this affidavit, and have personnal knowledge of the facts herein stated:


"On March 31st, 2013, at approximately 5:25 P.M. I was standing at my cell door, when I noticed that Officer, Crystal Trevino did not hand a Johnnie to the prisoners in 56-cell. I was housed in 53-cell.
Upon arriving at my cell door, the cell door opened and Officer Trevino did hand me my Johnny when I reached for it.
At no time did Officer Trevino order me to step away from the cell door or order me to sit on my bunk, prior to handing me my Johnnie.
As long as I have been housed at the McConnell Unit, on General Population I have been fed the same way. If an official policy exist the officers from the McConnell Unit do not employ it.
When Officer Trevino left my cell she kept feeding the rest of one-row the exact same way. When she was feeding 52-cell, Sgt. Alex Moreno, the Building Supervisor, came down from upstairs and stood between my cell and Offender Erbey Flores' cell, I then heard Offender Flores tell Sgt. A. Moreno that he had not been fed yet. Officer Trevino yelled "You'll are going to eat last", or words to this effect.
I can't remember what Offender Flores and Sgt. A. Moreno said after that due to the fact that I started to talk to my cell mate.
I remember that Offender Flores was injured when the cell door was slammed on his hand. And I remember the Sgt. came down from upstairs and took Offender Flores out of his cell. I saw blood on Offender Flores' left hand.


    I DECLARE UNDER PENALTY OF PURJURY THAT THE FOREGOING IS TRUE AND COR-
RECT, TO THE BEST OF MY KNOWLEDGE. SIGNED THIS THE 28 DAY OF Aug. 2014.

*Christopher Ramirez*

                    Chistopher Ramirez#607605
                    3001 South Emily Drive
                    Beeville, Texas  78102
THE UNDERSIGNED DECLARES UNDER PENALTY OF PURJURY THAT HE IS THE WITNESS IN
THE ABOVE INSTRUMENT, THAT HE HAS READ SAID INSTRUMENT, AND THAT THE INFORMA
TION CONTAINED THEREIN IS TRUE AND CORRECT
28 U.S.C.§1746 and 28 U.S.C.§1621.

*Christopher Ramirez*
                    Chistopher Ramirez#607605
                    WITNESS
c.c. file:cr/ef(wa)

Exhibit "I."

Mr. Jocobi
Scrogguine's Sworn
Affidavit.
One Page.

WITNESS AFFIDAVIT

STATE OF TEXAS
COUNTY OF BEE

RE: Cause Number 2:13-CV-00298, Flores v Trevino, et. al.
"

"My name is Jocobi Scroggiune, and my T.D.C.J.-I.D. Number is 1420315. I am over 18 years of age, of sound mind, capable of making this affidavit, and have personnal knowledge of the facts herein stated:

"On March 31st, 2013 at approximately 5:30 P.M. I was on my bunk when the Rover, Officer crystal Trevino, came to our cell door. At that time I was housed at 3 Building, C-Pod, 3-Section 49-cell. Mrs. C. Trevino was passing out the dinner Johnnies. My cell mate was standing at the cell door, and as soon as the cell door opened, he reached for the Johnnies that Mrs. Trevino had in her hand, and she gave them (Johnnies) to my cell mate.
Approximately 2 or 3 minutes later there was a commotion, I then got up and went to stand by my cell mate, and looked out the cell door. I saw Offender Erbey Flores, T.D.C.J.-I.D. #574931 talking to Sgt. Alex Moreno, I could not hear what they were saying, but I saw that Offender E. Flores had something wrapped around his forearm, and his left hand was bleeding.
Offender E. Flores was taken to the front, and I didn't see him no more until after shift change, which would be at around 8:30 P.M.
Approximately 5 minutes after Offender E. Flores left to the front, Officer Trevino came back and told Offender J. Nix to step out of the cell (56) and went in with a rag. Officer C. Trevino was wiping the blood off the cell floor with the rag.
J. Nix is Offender James Nix T.D.C.J.-I.D. #1736188, he was also Offender E. Flores' cell mate.


I declare under penalty of purjury that the foregoing is true and correct, to the best of my knowledge. Signed this the 31st day of July, 2014.

_Jocobi Scroggiune_

Jocobi Scroggiune#1420315
McConnell Unit, T.D.C.J.
3001 South Emily Drive,
Beeville, Texas 78102


The undersigned declares under penalty of purjury that he is the witness in the above instrument, that he has read said instrument, and that the information contained therein is true and correct. Pursuant to Title 28 U.S.C.§ 1746, and Title 28 U.S.C.§1621.

_Jocobi Scroggiune_

Jocobi Scroggiune#1420315
Witness.

c.c. file:js/ef(wa)

7-31-14

Exhibit "J."

Post Order -

07. 006

Fifteen Pages.



**TEXAS DEPARTMENT**

**OF**

**CRIMINAL JUSTICE**

**CORRECTIONAL INSTITUTIONS DIVISION**

<u>NUMBER</u>: **PO-07.006 (rev. 5)**

<u>DATE</u>: **March 9, 2012**

<u>PAGE</u>: **1 of 15**

<u>SUPERSEDES</u>: **PO-07.006 (rev. 4)**
**June 30, 2005**

<u>AUTHORITY</u>: **Rick Thaler, Director**
**Correctional Institutions Division**

# POST ORDER

| | |
|---|---|
| <u>**SUBJECT:**</u> | **ADMINISTRATIVE SEGREGATION OFFICER** |
| <u>**AUTHORITY:**</u> | *Administrative Segregation Plan* |
| <u>**REFERENCE:**</u> | American Correctional Association (ACA) Standard(s): #4-4257 |

*Administrative Segregation Plan*; TDCJ *Offender Visitation Plan*; *Use of Force Plan*; BP-03.91, "Uniform Offender Correspondence Rules;" AD-03.72, "Offender Property;" AD-04.11, "Security Precaution Designators;" AD-04.18, "Offender Jobs: Assignments, Job Descriptions, Selection Criteria, Work Programs and Supervision;" AD-10.20, "Identifying and Reporting Facility Maintenance Requirements;" AD-14.09, "Postage and Correspondence Supplies;" SM-01.01, "Correctional Institutions Division (CID) Security Polices and Procedures Systems;" SM-01.27, "Administration of Offender Medication;" SM-01.29, "Offender Management Restrictions;" SM-03.01, "Comprehensive Unit Searches;" SM-03.02, "Security Searches;" SM-05.03, "Management and Utilization of Chemical Agents;" SM-05.04, "Utilization of Stab Resistant Vests"

<u>**PURPOSE:**</u>  To specify the duties and responsibilities that shall be performed by the administrative segregation officer in providing security in the administrative segregation housing area. Written special orders specific to each unit as to offender movement within each administrative segregation housing area shall be attached to this unit post order in accordance with SM-01.01, "Correctional Institutions Division (CID) Security Polices and Procedures Systems."

<u>**DEFINITION:**</u>

"Administrative Segregation Housing Area" is the wing, pod, or cellblock where offenders assigned to administrative segregation are housed.

"Cell Inspection" is a visual examination to determine the compliance and structural integrity of the cell by examining the cell door, windows, bars, cell fixtures, locking mechanisms, and food slots if applicable, ensuring these items have not been tampered with or damaged. Offenders shall be required to exit the cell so a proper cell inspection can be conducted.

713

"Cell Search" is a physical examination of an offender's assigned housing area for contraband.

"Direct Supervision" is the oversight correctional staff maintains by having an offender within 'sight and sound.' There shall be no physical barriers between the offender and the correctional officer and a distance no greater than that in which a normal conversational voice volume can be maintained.

## PROCEDURES:

The administrative segregation officer shall be responsible for maintaining security of offenders assigned to administrative segregation.

I.   SECURITY MEASURES

    A.   All individuals shall present an identification (ID) card and be identified prior to entering or exiting an administrative segregation housing area.

        1.   When entering an expansion cellblock facility or a 2250, 12 building, a sign-in log, Visitor's Log, shall be used. Each individual shall complete an entry on the sign-in log.

        2.   The administrative segregation officer shall ensure the names of all individuals not assigned to the administrative segregation housing area are recorded on the Daily Activity Log, I-216.

        3.   The administrative segregation officer shall document the required information for offenders.

    B.   Stab-resistant vests shall be worn in accordance with SM-05.04, "Utilization of Stab-Resistant Vests."

    C.   Any offender worker entering or exiting the administrative segregation housing area (wing/pod/cellblock) shall be strip searched. While within the administrative segregation housing area, the offender worker shall be kept under direct supervision at all times.

    D.   All non-uniformed staff, contract employees, unit visitors, and volunteers shall be accompanied at all times by an administrative segregation officer while in an administrative segregation housing area.

    E.   Offenders who are assigned a Security Precaution Designator (SPD) shall be managed in accordance with AD-04.11, "Security Precaution Designators," along with established security procedures according to the offender's custody designation.

II.   INSPECTION ROUNDS

A.   At least every 30 minutes, the administrative segregation officer shall conduct a security round, checking the administrative segregation housing area for the following:

1.   Cleanliness;

2.   Fire hazards;

3.   Damage to state property;

4.   To ensure locking mechanisms on doors, cells, and gates are locked and secured; and ensure the door lighting systems, where applicable, are properly working; and

5.   Any discrepancies located while conducting the security round shall be documented on the individual offender's Segregation Confinement Record, I-201.

B.   During the security checks, the administrative segregation officer shall check all offenders for:

1.   Injury;

2.   Illness; and

3.   Prohibited behavior.

C.   At least once each day, or a 24-hour period, correctional officers in the administrative segregation housing areas shall perform bedbook checks during a time specified by the warden.  Bedbook checks shall normally be performed during nighttime hours, when offenders are confined to their cells.

D.   The administrative segregation officer shall remain alert for any signs indicating a threat to the security of the prison.

E.   The administrative segregation officer shall submit a Referral to Mental Health Services, I-214, to the Mental Health Services on any offender who exhibits extreme or unusual behavior.  The I-214 is for non-emergency referrals only.  For emergencies, correctional officers shall contact a security supervisor and the Mental Health or Medical Department immediately by phone or in person.

F.   Referrals to Mental Health shall also be noted on the I-201.  This behavior may include:

1.   A foul body odor; not showering for several days;

715

2.   A messy appearance; not shaving or cutting hair;

3.   A dirty cell; presence of food, feces, urine, or blood;

4.   Refusal to eat; has not eaten meals for one or more days;

5.   Remaining in the cell for several days;

6.   Hostility or refusal to communicate for no apparent reason;

7.   Crying, laughing, and talking to self;

8.   Paranoia, anxiousness, or fearfulness;

9.   Feelings of being spied on, monitored by satellites or computers; believes the food is poisoned; or suspicions of a plot against the offender;

10.  Preoccupation with religion; the offender communicates the belief of being a Prophet, Jesus, or God;

11.  Withdrawal or depression;

12.  Significant behavior or attitude change; and

13.  Any other condition in which correctional officers believes Mental Health Services should be made aware of.

III.   SEARCHES

A.   Cell Searches

1.   The administrative segregation officer shall conduct cell searches as assigned by a security supervisor in accordance with SM-03.02, "Security Searches." All administrative segregation cells shall be searched at least once per calendar month.

2.   Cell searches shall be documented on the Security Search Log, located in SM-03.02, "Security Searches."

B.   Cell Inspection

1.   Correctional officers assigned to administrative segregation housing areas shall ensure cell inspections are conducted at least once every 72 hours on every cell located in administrative segregation housing, which may be accomplished when the offender is removed from the cell to shower, recreate, or other similar activities.  Cell inspections shall be documented on the I-201 located in the *Administrative Segregation Plan*.  If an offender refuses to leave the cell to recreate or shower, a security supervisor shall be notified.

2.   A cell search may be conducted in conjunction with a cell inspection if the administrative segregation officer determines a more thorough search is needed.

C.   The administrative segregation officer shall ensure each administrative segregation cell is thoroughly searched and cleaned prior to assigning an offender to a cell.  The offender shall be strip searched prior to placement in the cell.

D.   The administrative segregation officer shall assist with the comprehensive unit searches of administrative segregation areas.   In accordance with SM-03.01, "Comprehensive Unit Searches," administrative segregation housing areas shall be locked down for a comprehensive unit search at least four times per calendar year.

IV.   STRIP SEARCH PROCEDURES

When an offender is to be released from the cell for any reason, the administrative segregation officer shall perform the following security measures:

A.   Offenders shall be ordered to submit to a strip search in accordance with AD-03.22, "Offender Searches," while inside the cell.

B.   Offenders shall lay their clothing in the food tray slot or in the cell bars and step back.  The administrative segregation officer shall thoroughly search the clothing, by pat searching the clothing and, if available, using a handheld metal detector.

C.   Offenders shall remain at the front of the cell and the administrative segregation officer shall maintain visual contact at all times during the strip search. If an offender leaves the front of the cell, or visual contact is broken, the strip search shall begin again from the beginning.

D.   The administrative segregation officer shall then order the offender to place their hands behind their back and outside the food tray slot, so hand restraints can be applied.

E.     When the offender complies with the order, the administrative segregation officer shall then place hand restraints on the offender and ensure the hand restraints are properly applied and double-locked.

F.     The cell door shall then be opened and the offender shall be ordered to "back" out of the cell.

G.     If the offender is being escorted inside of the administrative segregation housing area:

   1.     The administrative segregation officer shall keep male offenders' clothing, excluding boxer shorts, until reaching the destination for movement.

   2.     Offenders shall be allowed to slip their feet into shower shoes or other shoes after exiting the cell and prior to being escorted to any activity, such as to the shower.

   3.     Female offenders shall have their clothing returned to them at the cell after completing the strip search.

H.     If the offender is being escorted outside of the administrative segregation housing area for an activity that requires the offender to be fully dressed, the administrative segregation officer shall:

   1.     Return the approved clothing to the offender and observe the offender as the offender dresses.  As an option, an offender may be placed in a holding cell where the offender is allowed to get fully dressed.

   2.     Pat search the offender and, if available, search the offender with a hand-held metal detector to ensure the offender is not in possession of contraband.

V.     ESCORTING INSIDE THE ADMINISTRATIVE SEGREGATION HOUSING AREA

A.     When any type of restraint is used, it shall be in accordance with the *Use of Force Plan*.  The administrative segregation officer shall ensure all hand restraints are double-locked.

B.     Two (2) administrative segregation officers shall be assigned to each administrative segregation housing area for escorting, not including the picket officer, according to the Level schedule outlined below.

1. <u>Level I offenders</u> - Units may use one (1) administrative segregation officer to escort Level I administrative segregation offenders within the administrative segregation housing area.  However, when only one (1) administrative segregation officer is used to conduct the escort, the second administrative segregation officer shall be in close enough proximity to assist the other administrative segregation officer in case of an emergency.

2. <u>Level II offenders</u> - Units may use one administrative segregation officer to escort Level II offenders to and from the recreation area if the recreation area is attached to the administrative housing area.  However, when only one (1) administrative segregation officer is used to conduct the escort, the second administrative segregation officer shall be in close enough proximity to assist the other administrative segregation officer in case of an emergency.  If the recreation area is not attached to the administrative segregation housing area, Level II administrative segregation offenders shall be escorted to and from activity areas by two (2) administrative segregation officers within the administrative segregation housing area at all times.

3. <u>Level III offenders</u> – Units must escort Level III administrative segregation offenders to and from activity areas with two (2) administrative segregation officers within the administrative segregation housing area at all times.

4. <u>Level I protective custody offenders</u> –Offenders may be escorted by one (1) administrative segregation officer to and from activity areas, such as showers, recreation, and other similar activity areas.

    a. The determination for the need of restraints when escorting a Level I protective custody offender either inside or outside of the administrative segregation housing area shall normally be made by the warden or designee or the administrative segregation committee (ASC) that authorizes initial placement into administrative segregation and shall be reviewed by the ASC during subsequent reviews. This determination shall be documented on the I-201.  The use of restraints under this section shall be considered routine and shall not constitute a use of force unless the offender resists the placement of restraints.

    b. The ranking administrative segregation security supervisor may, on a case-by-case basis, determine that immediate existing circumstances require the use of restraints on a Level I protective custody offender. This determination shall be made on each occasion restraints are used, and a security supervisor shall document the reason for the use of restraints on the offender's I-201.

5. <u>Level II and III protective custody offenders</u> - Units must escort Level II and III protective custody offenders within the administrative segregation housing area with two (2) administrative segregation officers at all times.

719

6.  Any time an offender, except Level I protective custody offender, is transported out of the offender's assigned cell, the offender shall be strip searched and placed in hand restraints prior to opening the cell door. The offender shall then be directed to place the offender's arms behind the back and through the food slot so the administrative segregation officer can apply the hand restraints. Other restraints may be applied after the cell door is opened.

7.  Hand restraint straps may be used at the discretion of the warden.

8.  If deemed appropriate, the warden may decide to use two (2) administrative segregation officers to conduct escorts at all times.

9.  Whether or not restraints are to be removed from the offender after arrival at the destination requires the approval of a security supervisor on an individual basis. However, administrative segregation offenders shall not be recreated in hand restraints.

10. Before offenders are returned to the assigned administrative segregation cells from recreation, shower, or another similar activity and restraints have been removed, offenders, except Level I protective custody offenders, shall be placed in hand restraints.

11. Wardens may authorize riot batons to be carried inside any or all administrative segregation housing areas in accordance with the *Use of Force Plan*.

12. Offenders shall be placed behind a protective shield when being escorted on cellblock runs. Protective shields are not required on cellblocks with solid outer doors.

VI. MOVEMENT OUTSIDE THE ADMINISTRATIVE SEGREGATION HOUSING AREA

A.  All reasonable security measures shall be taken when escorting offenders outside the administrative segregation housing area, to include clearing hallways when necessary.

B.  At least two (2) administrative segregation officers shall be required when escorting offenders outside the administrative segregation housing area.

C.  The two (2) administrative segregation officers conducting the escort shall place the offender between them while in the hallway.

D.    All administrative segregation officers conducting an escort shall have a riot baton, thrust vest, and carry-on-person (COP) chemical agent in accordance with SM-05.03, "Management and Utilization of Chemical Agents." The riot baton shall be carried in a holder on the hip unless circumstances warrant otherwise. Riot batons shall only be used in a defensive manner and extreme caution shall be taken to ensure offenders do not gain control of the riot baton.

E.    Every effort shall be made by administrative segregation officers to ensure the safe escort of every offender.

F.    Upon arrival at the destination, and with a security supervisor's approval, the administrative segregation officer may remove the hand restraints from the offender.

G.    If an offender has a private interview, the interview shall be held in a room with only one (1) door and the administrative segregation officer shall wait attentively outside the door. The administrative segregation officer shall not allow any other offender to enter the room while an interview is being conducted.

H.    The offender shall be strip searched when returning to the assigned cell.

I.    All offenders shall have hand restraints applied when removed and before returning to the cells, except Level I protective custody offenders.

VII.    RECREATION

A.    The administrative segregation officer shall be responsible for monitoring out-of-cell recreation for offenders.

    1.    Recreation schedules shall be in accordance with the *Administrative Segregation Plan* and the recreation schedule of each unit.

    2.    All recreation shall be recorded on the I-216, including the time and length. If an offender refuses recreation, it shall also be noted on the log.

B.    Normally, recreation and exercise activities shall be confined to the hours of 5:30 a.m. to 10:30 p.m.

C.    Offenders shall be recreated before showering.

D.    A thorough search shall be conducted prior to the use of each recreational activity, to include dayrooms and outside areas, and at the completion of each activity. The search shall include, but is not limited to:

    1.    Locking devices;

    2.    Bars;

3.      Windows;

4.      Screens, fences, and expanded metal;

5.      Mats;

6.      Chinning bar;

7.      Benches;

8.      Tables;

9.      Toilets, urinals, and water fountains; and

10.     Any other area where contraband may be hidden.

E.      All offenders assigned to administrative segregation, except for Level I protective custody offenders, shall be thoroughly strip searched and placed in hand restraints before and after recreation periods.

F.      Hand-held metal detectors may be used to search the offender's clothing.

G.      Each exercise or recreation group shall be directly supervised by an administrative segregation officer at all times.

VIII.   VISITATION

Each offender shall be strip searched prior to exiting the cell for a visit, and prior to returning to the cell after a visit.   Visitation shall be conducted in accordance with the TDCJ *Offender Visitation Plan.*

IX.     UNSECURED OR OPEN SHOWER AREA

A.      When an offender in administrative segregation must be showered in an open shower, three (3) administrative segregation officers shall be present.  This does not apply to Level I protective custody offenders.

B.      The warden may modify this requirement if the shower area is secured by a lockable barred door.

1.      The offender shall be secured in the shower area before the hand restraints are removed.

2.      Hand restraints shall again be placed on the offender before the offender is allowed to exit the shower area.

3.    Prior to each use, the shower area shall be thoroughly searched, and shall be thoroughly searched at the completion of each activity.

X.    MEALS

A.    The administrative segregation officer shall supervise the feeding of meals and ensure:

    1.    Once the food cart has arrived, it shall immediately be plugged into an electrical outlet to ensure an appropriate temperature, unless it is a freestanding, thermal type of food cart;

        a.    Meals served from electrical food carts shall be served within one (1) hour from the time the tray is prepared; and

        b.    Meals served from thermal food carts shall be served within 30 minutes from the time the tray is prepared.

    2.    All trays, cups, and utensils shall be counted before distribution, to ensure all are accounted for at the end of the feeding period;

    3.    All offender workers and staff serving food shall wear approved hair coverings;

    4.    Offenders with medical, meat free, or pork free diets shall receive the appropriate meals;

    5.    The unit's restriction tracking method shall be used to identify offenders on certain restrictions, such as food loaf, container, disposable tray, and cup restrictions;

    6.    The Restriction Tracking Log, I-206, may be used to identify offenders on certain restrictions, such as food loaf, container, disposable tray, and cup restrictions; and

    7.    Each offender is served a full portion of the same foods offered to general population offenders.

PO-07.006 (rev. 5)
Page 12 of 15

B.    Serving Meals

1.    Prior to opening the food tray slot, the administrative segregation officer shall order all Level II and Level III administrative segregation offenders to go to the rear of the cell, face the wall, and place both hands behind their backs, unless medically incapable, as identified by Health Services staff. Once the offender complies with this order, the food tray slot shall be opened and the meal tray placed on the food tray slot. Only after the administrative segregation officer gives an order allowing the offender to retrieve the meal shall the offender be allowed to approach the food tray slot.

2.    If an offender refuses to comply with the procedure, the administrative segregation officer shall inform the offender that refusal to comply with this order shall constitute refusal to accept the meal. The administrative segregation officer shall document the refusal on the I-216.

3.    If an offender initially complies with the verbal order, then attempts to get up once the food tray slot is opened, the food tray slot shall be immediately secured. This action shall constitute the offender's refusal to accept the meal and will be documented on the I-216. Additionally, an Offense Report, I-210, shall be filed for "Refusing to Obey Orders."

XI.    OFFENDER PROPERTY

A.    Offenders shall retain personal property allowed in accordance with AD-03.72, "Offender Property" and the level to which they have been assigned. The ASC may restrict, on a case-by-case basis, only those items presenting a danger to the physical safety and security of staff, offenders, or others, or any item that may be used to assist in an escape. Restriction of these items shall be in accordance with SM-01.29, "Offender Management Restrictions."

B.    All offenders are allowed the following basic personal property items:

1.    Current legal materials or legal research materials with no metal fasteners or paper clips;

2.    Approved religious books or articles necessary for the practice of the offender's religion that do not violate the security of the prison;

3.    Photographs, letters, and approved publications which shall not contain sexually explicit images as defined in BP-03.91, "Uniform Offender Correspondence Rules;"

4.    Correspondence supplies, pursuant to AD-14.09, "Postage and Correspondence Supplies;"

5.    "Keep-On-Person" medications, in accordance with the *Pharmacy Policy and Procedures Manual* Number 50-05 or any medically required items;

6.    Health care devices and supplies prescribed for the offender by medical staff;

7.    One of each of the following personal hygiene items:  small comb or brush, soap, roll of toilet tissue, a pair of shower shoes, toothbrush, toothpaste or toothpowder, deodorant, shampoo, and conditioner;

8.    Two (2) pairs of TDCJ authorized or issued shoes, non-steel toe; and

9.    Necessities items:

Clothing and shower towels shall be furnished at shower time and exchanged on a one-for-one basis.  The clothing exchange shall be offered even if the offender refuses to shower.  Units allowing offenders to keep a shower towel in their possession are not required to issue a cell towel.

a.    Daily change of socks and undergarments;

b.    A shower towel and outer clothing, including pants and a shirt or coveralls, with sleeves for female offenders, provided at least three (3) times per week;

c.    One (1) cell towel, two (2) sheets, and a pillowcase, if appropriate, once per week;

d.    One (1) gown per week for female offenders;

e.    Mattress and pillow, or a mattress/pillow combination; and

f.    Seasonal items, such as thermals, jackets, and blankets.

10.    Wristwatch and wedding ring in accordance with AD-03.72, "Offender Property;"

11.    Gender-related hygiene items; and

12.    Cell cleaning supplies in an appropriate amount determined by unit administration.

C.    Level I offenders shall be allowed to possess the following additional property:

1.    Items approved for purchase through the commissary,

2.    One (1) state-issued razor, allowed at the warden's discretion;

3. General library books,

4. In-cell arts and crafts items in accordance with AD-14.59, "Offender Piddling and Craft Sales;" and

5. Gender-related items to include make-up, a slip, girdle, hair accessories, stud earrings, perfume, curling iron, hair rollers, and a hair dryer.

XII. IN-CELL ADMINISTRATION OF MEDICATION

The in-cell administration of medication for administrative segregation offenders shall be conducted in accordance with SM-01.27, "Administration of Offender Medication" and AD-06.43, "Administration of Acetaminophen (Tylenol)."

XIII. OTHER DUTIES AND RESPONSIBILITIES

A. The administrative segregation officer shall allow only offender workers, such as those assigned to work in food service, and other similar areas, with approval of a security supervisor in to the administrative segregation housing area. The administrative segregation officer shall be responsible for supervising any offender workers assigned to work in the administrative segregation housing area. The following rules shall apply to all offender workers entering the administrative segregation housing area:

1. All offender workers shall be strip searched before entering or exiting the administrative segregation housing area;

2. Offender workers shall be under direct supervision at all times while in the administrative segregation housing area in accordance with AD-04.18, "Offender Jobs: Assignments, Job Descriptions, Selection Criteria, Work Programs and Supervision;" and

3. Offender workers shall be removed from the 'administrative segregation housing area any time offenders assigned to administrative segregation are being escorted to showers, recreation, or in or out of the administrative segregation housing area.

B. Prior to a food tray slot being opened for any reason, such as feeding, passing out necessities, passing out medication, or any other similar reason, the offender shall be ordered to go to the back of the cell and face the wall. In addition to meal times, the warden may require Level II and Level III offenders to kneel at the back of the cell and place their hands behind their backs.

C.    Correctional officers assigned to administrative segregation shall:

1.    Be required to wear stab-resistant vests in accordance with SM-05.04, "Utilization of Stab-Resistant Vests," and carry-on-person (COP) chemical agents in accordance with SM-05.03, "Management and Utilization of Chemical Agents."

2.    Be responsible for immediately notifying a security supervisor of any emergency or potentially dangerous situation.

3.    Be responsible for ensuring all required documentation is turned in by the end of the shift, including the Inspection Log, AD-84, in accordance with AD-10.20, "Identifying and Reporting Facility Maintenance Requirements."

4.    Be knowledgeable of the *Administrative Segregation Plan* and TDCJ policies and procedures relating to the administrative segregation officer position.

5.    Without exceptions, wear safety glasses or goggles according to unit policy.

6.    Maintain custody and control of all assigned equipment.

7.    Be responsible for any other duties assigned by a security supervisor.



**Signature on File**

727

Exhibit "K"

Post Order -

07.007

Eleven Pages.



**TEXAS DEPARTMENT**

**OF**

**CRIMINAL JUSTICE**

**CORRECTIONAL INSTITUTIONS DIVISION**

| | |
|---|---|
| <u>NUMBER:</u> | PO-07.007 (rev. 4) |
| <u>DATE:</u> | June 1, 2011 |
| <u>PAGE:</u> | 1   of   11 |
| <u>SUPERSEDES:</u> | PO-07.007 (rev. 3)<br>October 31, 2005 |
| <u>AUTHORITY:</u> | Rick Thaler, Director<br>Correctional Institutions<br>Division |

# POST ORDER

<u>SUBJECT:</u>        **SOLITARY OFFICER**

<u>REFERENCE</u>:       American Correctional Association (ACA) Standard 3-4301

TDCJ Disciplinary Rules and Procedures for Offenders, SM-05.04, "Utilization of Stab-Resistant Vests," AD-03.53, "Solitary Confinement," AD-03.22, "Security Searches," TDCJ *Administrative Segregation Plan*, TDCJ *Use of Force Plan*, AD-14.09, "Postage and Correspondence Supplies," AD-03.72 "Offender Property," AD-03.83, "Offenders Who Refuse to Comply With Grooming Standards," SM-01.27, "Administration of Offender Medication," AD-03.80, "Implementation of Offender Management Status," BP-03.81, "Offender Access to the Courts, Counsel and Public Officials Rules"

<u>PURPOSE:</u>       To define the duties and responsibilities assigned to the position of the solitary officer with the purpose of providing security in the solitary confinement area.

Any written special orders specific to offender movements within each solitary confinement area on each unit shall be attached to unit post orders. The procedures outlined in these post orders and special orders shall be followed at all times.

<u>DEFINITION</u>:

"Solitary Confinement" is the segregation of an offender as a result of the disciplinary process in accordance with the *Disciplinary Rules and Procedures for Offenders*.

<u>PROCEDURES</u>:

The solitary officer is responsible for the security of staff and offenders in the solitary area.