UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ERBEY FLORES, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-298 |
| | § | |
| CRYSTAL TREVINO, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION**
**ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

In this § 1983 prisoner civil rights action, Plaintiff Erbey Flores alleges that Defendant Officer Crystal Trevino used excessive force against him on March 31, 2013 when she purposely slammed a cell door on his hand in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (D.E. 1, 11, 14). Pending is Defendant's motion for summary judgment to dismiss Plaintiff's excessive force claim for failure to state sufficient facts to establish that the force was applied maliciously and with the intent to harm Plaintiff. (D.E. 39). Plaintiff has filed a response in opposition and a cross motion for summary judgment. (D.E. 47, 48). For the reasons stated herein, it is respectfully recommended that the Court deny both summary judgment motions as genuine issues of material facts exist as to whether Defendant Trevino used the force at issue to maintain order and security, or maliciously and sadistically to cause physical harm to Plaintiff.

I.      **Jurisdiction.**

The Court has federal question jurisdiction over this action.  28 U.S.C. § 1331.

II.     **Procedural background.**

On September 26, 2013, Plaintiff filed his original complaint alleging that on March 31, 2013, Defendant used excessive force against him when she slammed Plaintiff's cell door shut as he was reaching for his food, hitting and injuring Plaintiff's left hand.  (D.E. 1).

A *Spears*[1] hearing was conducted on December 5, 2013, following which Plaintiff's excessive force claim against Defendant in her individual capacity was retained, and all other claims were dismissed.  (*See* D.E. 15, 18).

On April 7, 2014, Plaintiff filed a motion for leave to file an amended complaint. (D.E. 28).  On May 9, 2014, Plaintiff's motion for leave to amend was denied as to his request to add an Eighth Amendment claim of deliberate indifference to his serious medical needs against Defendant, as was his request to add a due process claim based on his allegation that Defendant filed a false disciplinary report against him.  However, Plaintiff was granted leave to file a state law negligence claim against Defendant, primarily because Defendant did not file a response objecting to the proposed amendment.  (*See* D.E. 31, p. 3).

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

On May 15, 2014, Defendant filed a Rule 12(b)(6) motion to dismiss Plaintiff's state law negligence claim against her. (D.E. 35). On June 30, 2014, the Court granted Defendant's motion to dismiss the state law claim. (D.E. 36).

On July 25, 2014, Defendant filed the instant motion for summary judgment. (D.E. 39, 40).

On August 18, 2014, Plaintiff filed a motion for continuance to file his summary judgment response because he had not been given the opportunity to view the video recording of the March 31, 2013 Use of Force (UOF) incident. (D.E. 42). Indeed, it was in response to Plaintiff's grievance about the incident that prompted prison officials to view the March 31, 2013 surveillance video of Defendant Trevino closing the cell door on Plaintiff's hand. (D.E. 39-3, p. 8). After viewing the video, McConnell Unit officials characterized the incident as a UOF and opened an investigation. *Id.* Because the video would be highly relevant, on August 19, 2014, it was ordered that Defendant produce a copy of the March 31, 2013 surveillance video to the Court and arrange a viewing of the video for Plaintiff. (D.E. 43).

On August 27, 2014, Defendant filed an advisory with the Court indicating that she had previously informed Plaintiff on May 13, 2014 and on July 11, 2014, that a copy of the surveillance video from March 31, 2013 no longer exists. (D.E. 44, p. 1). The video no longer exists because every twenty (20) days "new data" is recorded over existing surveillance footage. (*See* D.E. 44-8, pp. 2-4, at ¶¶ 4-6, Affidavit of Major Michael Alsobrook explaining supervision of correctional staff using surveillance video and noting that data is saved to hard drive for approximately twenty (20) days, and then

old data is recorded over by new data unless officials receive a request to preserve old data within twenty days following the incident).

On September 8, 2014, Plaintiff filed a response to Defendant's advisory and a motion for sanctions against Defendant.  (D.E. 45, pp. 1-5).  Plaintiff points out that a copy of the March 31, 2013 video existed on April 4, 2013 when prison officials viewed it and concluded at that time that a UOF investigation was warranted.  Pursuant to TDCJ policy, if a UOF investigation is warranted, the video is to remain as part of the UOF file.  Plaintiff argues that Defendant's failure to preserve the surveillance data, knowing that it formed the basis of a UOF claim, amounts to conduct that should be sanctioned.  (D.E. 45, pp. 1-2).

On September 25, 2014, Defendant filed a response in opposition to Plaintiff's request for sanctions.  (D.E. 46).

On September 26, 2014, Plaintiff filed his summary judgment response and cross motion for summary judgment.  (D.E. 47, 48).

## III.    Summary judgment evidence.

In support of her motion for summary judgment, Defendant offers the following evidence:

| | | |
|---|---|---|
| Ex. A: | Use of Force report and investigation for March 31, 2013 Use of Force, (D.E. 39-1, pp. 1-48); | |
| Ex. B: | Dismissal Log evidencing dismissal of Disciplinary Case No. 20130208287, (D.E. 39-2, pp. 1-3); | |
| Ex. C: | Plaintiff's TDCJ medical records from September 30, 2012 through January 14, 2014, filed under seal, (D.E. 40-1, pp. 1-34); | |

Ex. D:      Plaintiff's TDCJ grievance records and staff complaints related to the March 31, 2013 Use of Force, (D.E. 39-3, pp. 2-24);

Ex. E:      Affidavit of Defendant Crystal Trevino, (D.E. 39-4, pp. 2-4); and

Ex. F:      Affidavit of Warden Gary Currie, (D.E. 39-5, pp. 2-3).

Plaintiff offers the following evidence in support of his cross-motion for summary judgment:

The summary judgment evidence establishes the following:

Ex. A:      TDCJ Use of Force Plan (Feb. 2012), (D.E. 48-1, pp. 2-41, D.E. 48-2, pp. 1-29);

Ex. B:      Defendant Trevino's sworn affidavit, (D.E. 48-3, pp. 2-4);

Ex. C:      Plaintiff's schematic drawing of C-pod, (D.E. 48-3, pp. 6-8);

Ex. D:      Affidavit of Offender DeShannon Jackson testifying about the manner in which johnnie sack meals are delivered by officers to offenders (D.E. 48-3, p. 10);

Ex. E:      Affidavit of Offender Shawn Clark testifying that offenders in General Population (GP) are considered low risk and are not required to sit on their bunks when johnnie sacks are passed out but may stand near the cell door and/or reach for them when distributed, (D.E. 48-3, p. 12);

Ex. F:      Affidavit of Offender Ray Rodriguez testifying that GP offenders are *never* ordered to step away from the cell door when johnnie sacks are distributed (D.E. 48-3, p. 14);

Ex. G:      Affidavit of Plaintiff, (D.E. 48-3, pp. 16-19);

Ex. H:      Affidavit of Offender Christopher Ramirez testifying as to the events that occurred just prior to the March 31, 2013 UOF, (D.E. 48-3, p. 21);

Ex. I:      Affidavit of Offender Jocobi Scrogguine testifying that he observed Plaintiff's cellmate cleaning  blood from the cell floor on March 31, 2013, (D.E. 48-3, p. 23);

Ex. J:          TDCJ Post Order (PO-07.006 (rev. 5)) regarding the duties of the Administrative Segregation Officer (D.E. 48-3, pp. 25-39);

Ex. K:          TDCJ Post Order (PO-07.007 (rev. 4)) regarding the duties of the Solitary Officer (D.E. 48-3, p. 41 and 48-4, pp. 1-10);

Ex. L:          UOF Statement of Officer Imaobong Okon Samuel, (D.E. 48-4, p. 12-13);

Ex. M:          Information on UOF dated April 4, 2014, (D.E. 48-4, p. 15);

Ex. N:          Information on UOF dated April 9, 2014, (D.E. 48-4, p. 17);

Ex.O:           X-ray report dated April 17, 2013, (D.E 48-4, p. 19);

Ex. P:          Report from UOF Supervisor in Huntsville to Deborah Garza at the McConnell Unit stating that the medical evaluation "needs to be changed to an 01," (D.E. 48-4, p. 21);

Ex. Q:          Plaintiff's medical records dated November 14, 2013 concerning left hand pain, (D.E. 48-4, p. 23);

Ex. R:          Information on UOF dated April 23, 2014, (D.E. 48-4, p. 25);

Ex. S:          Photographs of Plaintiff taken on April 4, 2013, (D.E. 48-5, pp. 2-30;

Ex. T:          Plaintiff's medical records dated February 21, 2013, (D.E. 48-5, pp. 5-6);

Ex. U:          March 31, 2013 Offense Report, (D.E. 48-5, pp. 8-9);

Ex. V:          Affidavit of Warden Gary Currie, (D.E. 48-5, pp. 11-12);

Ex. W:          Employee UOF Fact Finding Inquiry, (D.E. 48-5, p. 14); and;

Ex. X:          Witness Statement of Sergeant Alex Moreno, (D.E. 48-5, p. 16).

(D.E. 48 – 48-5).[2]

 The summary judgment evidence stablishes the following:

  *A.  G-2 Offenders and Johnnie sack meals.*

 Plaintiff is classified as a G-2 inmate, and was so on March 31, 2013.  (D.E. 48-3, p. 16).  Normally, G-2 inmates eat their meals in the chow hall.  *Id.*  However, on certain occasions G-2 inmates are required to eat cold meals, known as "johnnie sacks; for G-2 inmates, johnnie sacks are served in the offender's cells, the dayroom, or the recreation yard.[3]  *Id.*  Because the cell doors of G-2 offenders do not have food slots, the cell doors must be opened by the picket officer to allow the serving officer (rover) to deliver the johnnie sacks.  *Id.*  For distribution, the johnnie sacks are kept in a bread crate.  *Id.*  On the first floor (row 1), the bread crate is rolled on wheels.  *Id.* at 17.  However for row 2 and row 3, the officer must carry the crate.  *Id.*  The offenders help the rover by closing the cell door after delivery of the johnnies.  *Id.*  If no drink is delivered with the meal, the rover will allow the offender to step out of the cell to get cold water from the dayroom cooler.  *Id.*

---

[2] Plaintiff acknowledges that the majority of his exhibits have been obtained from Defendant's supplemental disclosures and Defendant's own summary judgment evidence.  (*See* D.E. 48-6, p. 1).  For simplicity, reference to the identical exhibits offered by both parties will be to Defendant's exhibits.

[3] Plaintiff explains that johnnie sacks are often delivered when there is a "suspension of activities" due to staff shortages.  (D.E. 48-3, p. 17).

B.    *The March 31, 2013 UOF.*

The day of the UOF, March 31, 2013, fell on Easter Sunday, and only a limited number of staff was working.  (D.E. 48-3, p. 17, Plaintiff's Aff't).  As such, the McConnell Unit was under a "suspension of activities" and johnnie sacks were served for dinner that evening.  *Id.*  Defendant Trevino and Sergeant Moreno were working C-section;[4] Defendant Trevino was on 1-row, and Sergeant Moreno was on 2-row and 3-row.  As Defendant Trevino approached Plaintiff's cell, he said to her: "They need to put you to work on the pods more often, Big-Head Ass."  *Id.*  Defendant Trevino told Plaintiff to "shut up," and he responded that he did not have to be quiet, and this interaction continued for several minutes until Defendant Trevino left the area without giving Plaintiff his dinner.  *Id.*

Shortly thereafter, Sergeant Moreno came downstairs and passed by Plaintiff's cell.  (D.E. 48-3, p. 17, Plaintiff's Aff't).  Plaintiff attempted to talk to Sergeant Moreno, but he ignored him.  *Id.*  Plaintiff yelled to Sergeant Moreno that his section had not yet been fed, and Defendant responded: "You'll are going to eat last."  *Id.*  Plaintiff complained that Defendant Trevino was punishing him for no good reason, and he told Sergeant Moreno: "Say Sarge, you need to talk to that Ho [Trevino], that Ho's tripping."  *Id.*  Sergeant Moreno asked Plaintiff what he had done to upset Defendant Trevino, and he denied doing anything.  *Id.* at 17-18.  Sergeant Moreno commented "we'll see," and

---

[4] Plaintiff alleges that Defendant Trevino and Sergeant Moreno were romantically involved at the time of the UOF.  (D.E. 48-3, p. 17).  However, whether this accusation is true or not does not bear on Plaintiff's excessive force claim against Defendant Trevino.

returned upstairs without resolving the problem between Plaintiff and Defendant Trevino. *Id.* at 18.

After feeding all of the other inmates on 1-row, Defendant Trevino returned to Plaintiff's cell.  (D.E. 48-3, p. 18, Plaintiff's Aff't).  Defendant Trevino held the johnnie sacks in her right hand, slightly elevated and extended, and Plaintiff believed she was going to hand the johnnie sacks to him at that time.  *Id.*  Defendant Trevino told Plaintiff that he needed to stop talking about her appearance, and at the same time, the picket officer opened the cell door.  *Id.* at 18.  Plaintiff reached out with his left had to grab the johnnies, and Defendant Trevino slammed the cell door.  *Id.*  The cell door did not lock but bounced off of Plaintiff's hand.  *Id.*  Plaintiff pulled his hand back into the cell, and then Defendant Trevino slammed the cell door shut.  *Id.*

The pain in Plaintiff's hand was so intense that he immediately went to the sink and ran cold water over it.  (D.E. 48-3, p. 18, Plaintiff's Aff't).  His left hand was bleeding and he wrapped it in a wash cloth.  *Id.*  Defendant Trevino told Plaintiff that he had to sit on his bunk if he wanted to receive his meal, and he responded that he did not want to eat, but needed to go to medical for his injured hand.  *Id.*  Plaintiff and Defendant Trevino continued to argue for approximately five minutes until Sergeant Moreno came downstairs and to Plaintiff's cell.  *Id.*  Plaintiff told Sergeant Moreno that Defendant Trevino had slammed the cell door on his hand, that his hand was bleeding, and that he needed to go to medical.  *Id.*  Sergeant Moreno told Plaintiff that he would probably receive a disciplinary case, but he wrote him a pass to go to medical.  *Id.*

Plaintiff was seen in the McConnell Unit infirmary by Nurse Timothy Teboe at 8:06 p.m. (D.E. 40-1, pp. 26-31). Plaintiff related that Officer Trevino had slammed the cell door on his hand while passing out dinner. *Id.* at 28. Upon examination, Nurse Teboe noted swelling to the top left of Plaintiff's left hand with limited range of motion. *Id.* Nurse Teboe prescribed a poster splint to Plaintiff's left forearm for one week, and Ibuprofen, 600 mg, for three days. *Id.* at 30. Plaintiff was told to return for follow-up care thereafter. *Id.*

On April 1, 2013, Plaintiff was charged with the disciplinary offenses of refusing to obey orders and self-inflicted bodily injury for secondary gain in Disciplinary Case No. 20130208287 (D.E. 39-3, p.14). Although Plaintiff was initially found guilty of the charged offenses, the disciplinary conviction was overturned and dismissed because the administration failed to obtain psychiatric clearance prior to conducting the hearing. (*See* D.E. 39-2, p. 3).

On April 3, 2013, Plaintiff returned to the infirmary where he was seen by Nurse Joseph Shollenbarger for complaints of continuing left hand pain. (D.E. 40-1, pp. 12-14) Upon examination, Nurse Shollenbarger noted that Plaintiff's left hand remained swollen, and he ordered x-rays to rule out fracture. *Id.*

On April 3, 2014, Plaintiff filed a Step 1 grievance, Grievance No. 2013122647, complaining about the March 31, 2013 incident in which his left hand was injured. (D.E. 39-3, pp. 5-6). A videotape was available of the incident at that time, and after review of the camera surveillance tape, prison officials concluded that a UOF had occurred and that

a UOF investigation was necessary.[5]  *Id.* at p. 11.  Warden Monroe assembled a UOF team to investigate the incident.  *Id.*

On April 4, 2013, the UOF team escorted Plaintiff to medical for a UOF examination.  (D.E. 39-1, p. 11).  Nurse Jeffery Borders conducted a UOF physical and noted that Plaintiff had been treated on both March 31, and April 3, 2013 for a swollen left hand, and that x-rays had been ordered.  *Id.*  Photographs were taken of Plaintiff's left hand.  *Id.*

As part of the UOF investigation, a statement was taken from Defendant Trevino. (*See* D.E. 39-1).  Defendant Trevino reported that Plaintiff had been using offensive language toward her while she passed out the meals and that she left his area to feed the rest of the row.  *Id.*  When she returned to Plaintiff's cell, Defendant Trevino ordered Plaintiff to move to the back of his cell so that he and his cellmate could be fed.  *Id.* at 14-15.  Defendant Trevino continued in her statement:

> …Flores did not want to move and continued to curse.  At that moment the picket officer opened the door.  I quickly closed it so that I wouldn't have trouble with Flores coming out.  A moment later the cell door opened again.  I quickly closed the door again only this time offender Flores stated that I hit him with the door.  I did not see his hand in the

---

[5] Plaintiff requested a copy of the March 31, 2013 videotape of the incident.  However, the particular surveillance tape was stored to a hard drive for approximately twenty days after it was recorded, and then new data was recorded over it.  (*See* D.E. 44, p. 2).  Plaintiff points out that, pursuant to its own policy, the TDCJ was required to preserve a copy of the UOF video and make it a part of the UOF investigation file, and he argues that its failure to do so should result in sanctions.  (*See* D.E. 45).  Defendant Trevino admits that the surveillance video was taped over and is therefore no longer available to produce to Plaintiff, but points out that she was never in possession of the video tape itself, and further, that Plaintiff has no evidence that the spoliation of the video recording was done intentionally or in bad faith.  (D.E. 46).  Indeed, there is no evidence that Defendant Trevino failed to produce or spoiled evidence within her control and it is respectfully recommended that Plaintiff's motion for sanctions (D.E. 45) be denied.

> doorway when I was closing it.  I asked Flores to show me his
> hand and he said: "No, f--k all that, get a supervisor."  He
> then got up, went to the sink, put cold water over his hand.
> [He] sat back down holding his hand.  I then called for a
> supervisor.

(D.E. 39-1, pp. 14-15).

In his UOF statement given April 4, 2013, Plaintiff admits that he used inappropriate language toward Defendant Trevino, but states that she also swore at him and ordered him to shut-up and to move away from the door if he wanted his meal.  (D.E. 39-1, p. 17).  When the door opened, he reached for his meal, and Defendant Trevino slammed the cell door, catching Plaintiff's left hand between the door and the door frame. *Id.*  Plaintiff pulled his hand back and Defendant Trevino then slammed the cell door shut.  *Id.*  Plaintiff continued:

> After running some water over and wrapping my left hand, I
> advised Trevino that I needed medical attention.  She replied
> with "If you want to eat, then sit on your bunk."  I told her
> that I didn't want to eat, I needed medical attention.  This
> exchange went on for 5 or 6 minutes.  Sergeant Moreno came
> downstairs and stopped at my cell.  I informed Sergeant
> Moreno that Trevino had slammed the door on my left hand.
> Sergeant Moreno again asked me: "What did you do to her,
> mother f---er?"  I answered, "Nothing.  Look, my hand is
> bleeding.  I need some medical attention.

(D.E. 39-1, p. 17).

On April 4, 2013, a Confidential UOF Information on Participants Form was generated and listed the reason for the UOF as: "[Plaintiff] Displayed Abnormal Behavior" and that neither Plaintiff nor Defendant Trevino was injured.  (D.E. 48-4, p. 15).  On April 9, 2013, a second Confidential UOF Information on Participants form

listed the reason for the force as "obstructed a slot/cell door" and that no participant was injured.  (D.E. 48-4, p. 17).  On April 23, 2013, a third Confidential UOF Information on Participants form was generated.  (D.E. 48-4, p. 25).  On this form, the reason for the UOF was again listed as obstructed a slot/cell door, but it was noted that Plaintiff sustained an injury from the force.  *Id.*

Upon conclusion of the UOF investigation, the administration found that Defendant Trevino's actions were ***not*** consistent with the TDCJ's UOF Plan or with TDCJ Policies and Procedures, but that the force employed was justified under the particular facts of this case.  (D.E. 39-1, pp. 3-4).

On June 18, 2013, Warden Barber denied Plaintiff's Step 1 Grievance No. 2013122647, reporting:

> Unit administration conducted a thorough investigation into your allegations and the incident was determined to be unintentional/accidental contact.  You were evaluated and treated for any injuries that you claimed.  A referral is also made to the Office of the Inspector General.  No further action will be taken.

(D.E. 39-3, p. 6).

On July 1, 2013, Plaintiff filed a Step 2 appeal of Grievance No. 2013122647. (D.E. 39-3, pp. 3-4).  On August 1, 2013, Plaintiff's Step 2 appeal was denied with the notation that the Office of the Inspector General had reviewed and evaluated Plaintiff's claims and the evidence on file and found insufficient evidence to warrant further investigation.  *Id.* at p. 4.

**IV.     Summary judgment standard.**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.   Discussion.

### A.   42 U.S.C. § 1983.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.

42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).  A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir. 1983).  There is no vicarious or *respondeat superior* liability of supervisors under section 1983.  *Thompkins v. Belt,* 828 F.2d 298, 303-04 (5th Cir. 1987).  *See also Carnaby v. City of Houston,* 636 F.3d 183, 189 (5th Cir. 2011) (the acts of subordinates do not trigger individual § 1983 liability for supervisory officials).  For a supervisor to be liable under § 1983, the plaintiff must show that (1) the supervisor failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the constitutional violation; and (3) the failure to train or supervise amounts to deliberate indifference to the plaintiff's constitutional rights. *Roberts v. City of Shreveport,* 397 F.3d 287, 292 (5th Cir. 2005). Establishing a supervisor's deliberate indifference generally requires a plaintiff to demonstrate "at least a pattern of similar violations."  *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 427 (5th Cir. 2006) (citations omitted).

### B.  Excessive force.

Plaintiff claims that Officer Trevino, while acting under color of state law in her capacity as a TDCJ corrections officer, violated his rights under the Eighth Amendment by using excessive force.

To state a claim for excessive force, a prisoner-plaintiff must show that the force was not applied in a good-faith effort to maintain or restore discipline, but was applied maliciously and sadistically to cause harm, and that the injury he suffered was more than *de minimis,* but not necessarily significant. *See Hudson v. McMillian*, 503 U.S. 1, 6, 10 (1992); *Gomez v. Chandler*, 163 F.3d 921, 923-24 (5th Cir. 1999); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997). The factors to be considered are (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any effort made to temper the severity of a forceful response. *Gomez*, 163 F.3d at 923.

In *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam), the Supreme Court ruled that a district court "erred in dismissing Wilkins' excessive force complaint based on the supposedly *de minimis* nature of his injuries." *Id.* at 40. The Court grounded this conclusion on the principle that "'the core judicial inquiry' [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* at 1178 (citations omitted). Thus the focus is on whether the force itself is the sort that is "repugnant to the conscience of mankind," regardless of whether the inmate has the good fortune to escape with limited injuries. *Wilkins,* 559 U.S. at 39.

Plaintiff testified that his hand was slammed in the cell door, following which it was swollen and sore for several days, and the objective medical evidence confirms his testimony. (*See* D.E. 40-1, pp. 1-34). Indeed, the swelling was significant enough that an

x-ray was ordered to rule out fracture, which was done.  (*See* D.E. 39-1, p. 1, 32, copy of offender report of lab/x-ray result and corresponding radiology report).   Plaintiff continued to complain of pain associated with his left hand and wrist for several months thereafter.  *Id.*

The Fifth Circuit has not created a bright line rule or definition of what constitutes a sufficient physical injury to state a viable claim for Eighth Amendment purposes as opposed to injury that is deemed *de minimis.*  The Fifth Circuit has simply stated the general rule that "some" physical injury is required to constitute an excessive-force claim under the Eighth Amendment.  *See  Siglar v. Hightower,*  112 F.3d 191, 193 (5th Cir. 1997) (citing *Hudson v. McMillian,* 503 U.S. 1 (1992)).   A physical injury is the sort actionable under the Eighth Amendment if it is "an observable or diagnosable medical condition requiring treatment by a medical care professional."  *Luong v. Hatt,* 979 F. Supp. 481, 486 (N.D. Tex. 1997).  In that regard, a more-than *de minimis*  physical injury is not a sore muscle, aching back, scratch, abrasion, or bruise of the type that would not otherwise force a "free world person" to seek medical treatment.  *Id.*  This standard is consistent with what the Fifth Circuit has found sufficient to make an Eighth Amendment claim for excessive force.  For example, the Fifth Circuit has decided that, where an officer twisted a prisoner's arm and twisted his ear, resulting in bruising and soreness that lasted for three days, the injury was *de minimis* and would not support an Eighth Amendment claim.  *See Siglar,*  112 F.3d at 193-94.  *See also Earl v. Dretke,*  177 Fed. Appx 440, 2006 WL 1096707 (5th Cir. 2006) (allegations that an officer injured an inmate by causing him to lose a fingernail, which caused bleeding and swelling, fail to

state an excessive force claim because the injuries were *de minimis*).   Another circuit court of appeals has also found that two small bruises and minor cuts were clearly *de minimis.  See Corsetti v. Tessmer,* 41 Fed. Appx 753, 755, 2002 WL 1379033 (6th Cir. 2002); *see also Johnson v. Moody,* Case No. 05-0196, 2006 WL 898135, *6 (S.D. Ala. Mar. 29, 2006) (concluding that a cut on an inmate's right middle finger was a *de minimis* injury that did not establish an Eighth Amendment claim for excessive force).

By contrast, allegations that an inmate has suffered injuries resulting in long-term damage as the result of an intense encounter with correctional officers are not likely to be considered *de minimis*.   In *Gomez v. Chandler,* 163 F.3d 921, 924-25 (5th Cir. 1999), the Fifth Circuit found that the plaintiff demonstrated more than *de minimis* physical injury where he allegedly suffered multiple "cuts, scrapes, contusions to the face, head, and body" as a result of being knocked down so that his head struck the concrete floor, his face was then scraped against the floor, he was repeatedly punched in the face by two officers using their fists for about five minutes, and then head, after which one of the two officers continued to hit the plaintiff with his fist.  *See also Hudson*, 503 U.S. at 10 (blows that caused loosened teeth and a cracked dental plate are not *de minimis* for Eighth Amendment purposes).

In this case, the uncontested medical evidence establishes that Plaintiff has suffered more than a *de minimis* injury.  Initially his hand was bleeding and swollen.   He was given a splint and prescribed pain relievers.   Ultimately, x-rays were necessary to rule out a fracture due to continuing pain and swelling.  He continues to suffer from left

hand pain, and Defendant fails to offer any evidence to establish that the continuing pain can be attributable only to his preexisting carpel tunnel syndrome.

Because Plaintiff has established more than a *de minimis* injury, the issue  whether Defendant Trevino use of force was employed in a good faith effort to maintain or restore discipline, or maliciously and sadistically with the main intent to cause harm.  *Wilkins*, 559 U.S. at 40.  In response to Plaintiff's excessive force claim, Officer Trevino has offered her affidavit.  (D.E. 39-4, pp. 2-4).  Defendant reiterates the testimony that she provided throughout the OIG investigation and confirmed by Plaintiff's recitation of the uncontested portion of the facts: while passing out dinner, she and Plaintiff exchanged words and so she left his area without feeding him at that time.  However, the facts are in dispute as to what actually happened regarding the slamming of the cell door.  According to Defendant Trevino, she ordered Plaintiff to move away from the cell door, but he refused.  Defendant testified further:

> … Flores refused my order and continued cursing, and, without warning, the cell door began to open.  In a split second I slammed the door shut for fear that Flores would exit the cell.  Flores is considerably larger than me as I am a petite female, and as I grabbed the door to slam it shut I thought of nothing but being attacked by a belligerent inmate.  Then, without warning, the cell door began to open again, and in an instant I slammed the door again, afraid for my own safety.  I slammed the door both times in a split second without even taking a second to think or check for the offender's hand (which he had no reason to have in the doorway)

(D.E. 39-4, pp. 2-4, Trevino Aff't at ¶¶ 5-6).

In response, Plaintiff has offered the affidavits of other GP offenders who testify that they are not required to stand away from the cell door or to sit on their bunks when johnnie sacks are distributed, but instead, are allowed to take the johnnie sacks from the officer's hands and to shut the cell door thereafter.  (*See* D.E. 48-3, p. 12, Clark Aff't, testifying that GP offenders are considered 'low risk;" D.E. 48-3, p. 14, Rodriguez Aff't testifying that GP offenders are not required to move away from cell door when johnnie sacks are distributed; and D.E. 48-3, p. 10, Jackson Aff't, testifying about distribution of johnnie sacks to GP inmates with no required procedure in place).  Plaintiff also points out that, upon viewing the now-unavailable surveillance video, prison officials characterized the door slamming incident as a UOF that required further investigation and documentation.  (*See* D.E. 39-1, pp. 3-48).

The UOF investigation found Defendant's actions were justified.  (D.E. 39-1, pp. 4-5).   However, the internal investigation also found that "staff actions" were not consistent with the TDCJ Use of Force Plan or with TDCJ Policies and Procedures.  *Id.*  Defendant offers the affidavit of Warden Currie to explain these seemingly contradictory findings;

> … Through the investigation, unit administration determined that the force used by Ms. Trevino was justified under the circumstances and her actions were appropriate.  Any reference in the UOF report to inappropriate staff actions or failure to follow TDCJ procedures refer to actions taken by the sergeant supervising Ms. Trevino, not to any actions taken or not taken by Ms. Trevino.
>
> Under the circumstances as they were revealed through our investigation, I would expect Ms. Trevino , or any other officer, to react to an offender who had been cursing at her

> and refusing to obey an order to move away from the door in the same manner in which Ms. Trevino did – by immediately attempting to close the door in order to protect herself from the inmate and maintain the security of the unit.  Furthermore, Ms. Trevino acted appropriately when she immediately called for a supervisor when she realized that the offender needed medical attention.

(D.E. 39-5, pp. 2-3, Currie Aff't at ¶¶ 4-5).

Nothing in the UOF investigation report confirms Warden Currie's statement that the findings concern Defendant Trevino's supervisor and not her.

Plaintiff claims that Defendant Trevino intentionally slammed the cell door on his hand.  Captain J. Gonzales reviewed the video surveillance and stated that the door slamming "appears to be unintentional."  (D.E. 39-3, p. 8).  However, this finding is in conflict with Defendant Trevino's own testimony as she admits that she intentionally slammed the door to prevent Plaintiff from exiting the cell, but she did not realize Plaintiff's hand was in the way.  (D.E. 39-4, p. 3).  Regardless, a factual dispute remains as to Defendant Trevino's state of mind and whether or not she was attempting to maintain or restore order, or acting maliciously and sadistically to cause Plaintiff pain. Accordingly, summary judgment is not appropriate for either party, and the issue of whether or not Defendant Trevino's actions amounted to excessive force within the circumstances of this case must proceed to trial.

**V.    Recommendation**.

For the reasons discussed above, it is respectfully recommended that the Court deny Defendant's motion for summary judgment (D.E. 39) and deny Plaintiff's cross-motion for summary judgment (D.E. 48), and that this case proceed to trial on Plaintiff's

excessive force claim against Defendant Trevino.  It is respectfully recommended further that Plaintiff's motion for sanctions against Defendant for failure to produce the video (D.E. 45) be denied.

Respectfully submitted this 3rd day of October, 2014.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).